GRIFFIN, J„
dissenting.
The author of a dissenting opinion always worries whether anyone will bother to read the dissent or care what it says. In a case such as this, where the majority opinion is as long as this one and contains *674 so much extraneous material, the worry is whether the reader will even find the dissent, much less have the energy to read it. It does not help that the issue in this case is whether Keene is entitled to a judgment under section 163.3215, Florida Statutes, that Putnam County’s issuance of a special use permit to the Wilsons is inconsistent with the County’s Comprehensive Plan — a topic not likely to rivet the attention of most readers. Nevertheless, I suggest to the half-dozen or so of you who are still reading that this case has elements of a pretty good human drama and is an excellent example of what can happen when (the majority of) an appellate court disagrees with a result in the trial court.
I am writing this dissent because I believe Mr. and Mrs. Wilson’s rights to use their land according to the law has wrongly been taken, because Putnam County’s interpretation of its own Comprehensive Plan and Land Development Code has wrongly been rejected, and because Judge LaRue’s factual findings and legal conclusions have been wrongly ignored and his judgment in favor of the Wilsons wrongly reversed.
Mr. and Mrs. Wilson own 11.25 acres of land in Putnam County, occupied by their residence and horse ranch. Twice annually, they host a properly permitted[4] competitive trail and endurance ride into the adjacent Etoniah State Forest, using their property as the staging area. This is an activity sanctioned and judged by the South Eastern Distance Riders Association [“SEDRA”]. There is a $65 fee for participation. Participants arrive at the Wil-sons’ ranch on Friday in their campers or other recreational vehicles, bringing their horse and portable pen that hooks to their horse trailer. On Saturday, after camping overnight, the participants set off on horseback into the State Forest. They participate in a full day’s ride through the Forest, again stay overnight in their campers or RV’s and leave by Sunday. According to the Wilsons, this activity proceeded with Keene’s cooperation until December 2005, when there was a fight between the Wilsons’ dog and Keene’s dog. Only then did it become an issue of state-wide land-use policy concern.
After it was determined that the County would require the Wilsons to get a Special Use Permit to continue the trail rides and for Mrs. Wilson to continue to give riding lessons to local children at their home, Putnam County conducted a contested hearing and site visits by staff and several County commissioners were made. The Special Use Permit was approved with conditions that limited the number of annual rides to two and the number of riding students to six.
Mr. Keene promptly filed suit pursuant to section 163.3215, Florida Statutes, challenging the Wilsons’ Special Use Permit as a “Development Order”[5] that is inconsis *675 tent with the County’s Comprehensive Plan. After a multi-day non-jury trial involving some seventeen witnesses, including an “expert” land planner hired by Mr. Keene, Judge LaRue rejected Mr. Keene’s claim that the Special Use Permit was not consistent with the Comprehensive Plan.
Section 163.3125 only applies to inconsistency with a county’s Comprehensive Plan. Therefore, the issue in this case simply is whether the trial court erred by deciding that the Wilsons’ proposed uses of their property (the trail rides and riding lessons) are consistent with Putnam County’s Comprehensive Plan. In his cogent order, Judge LaRue not only found no inconsistency, he found that “the activities ... are specifically authorized ... as Activity-based and Resource-based within the meaning of the Comprehensive Plan....” Here are Judge LaRue’s conclusions:
1. The activities permitted under the SUP are consistent with, and meet all the requirements of, the goals, objectives and policies of the Future Land Use Element of the Putnam County Comprehensive Plan and of Section 12.12.03 of the County’s Land Development Code.
2. The activities permitted under the SUP are specifically authorized as a special use in the Rural Residential future land use zoning classification of the Wil-sons’ parcel as Activity-based and Resource-based within the meaning of the Comprehensive Plan and the Land Development Code.
3. The location, scale and intensity of the activities are compatible with the overall character of the existing future development of the area and are consistent with the surrounding land in the area.
4. The activities do not materially adversely impact nor unduly restrict the enjoyment of permitted uses in the surrounding area or by neighbors.
5. The Staff report citing Rural Recreational use as being one of the uses allowed for the Wilsons’ parcel under the Comprehensive Plan was in error, but the term was not specifically relied upon by the ZBOA.
6. The ZBOA heard evidence during its April 19, 2006 hearing on the Wilsons’ application for the SUP and made its decision to issue the SUP based on many factors, including the uses sought under the SUP which were Activity-based and Resource-based within the meaning of the Comprehensive Plan.
7. The SUP could have been issued by the ZBOA without the incorrect reference in paragraph a. of the Staff Report as to the Wilsons’ parcel allowing Rural Recreational uses under the Comprehensive Plan.
(Emphasis added). In order to verify the correctness of this judgment, we need only go to the Comprehensive Plan itself.
Under the Comprehensive Plan, the future land use classification for the Wilsons’ property is designated “Rural Residential.” The Rural Residential category, which is number 4 in the Comprehensive Plan, is described in seven paragraphs that *676 specify what it does and does not include, summarized as follows:
(a) Limited Agricultural Uses are permitted
(b) Residential Development is allowed with a maximum density of one dwelling per 5 acres or per one acre depending on various factors
(c) Neighborhood Commercial Uses allowed in a PUD zoning district
(d) No industrial use allowed
(e) Community facilities may be allowable
(f) Activity and Resource-based recreational uses are allowed
(g) Maximum Floor Area Ratios for residences are specified
(Emphasis added).
The section (f) category of “Activity-based” and “Resource-based” recreational uses expressly includes “marinas, fish camps, campgrounds and other camps,” which the Plan says “may be limited ... to mitigate impacts on the natural resources they utilize and to mitigate impacts on adjacent residential development.”[6] This provision in the Comprehensive Plan leaves no doubt that the Activity-Resource-Based category in Section 4(f) of the Comprehensive Plan is intended to allow uses in the nature of a campground or a fish camp or marina for the enjoyment of adjacent natural resources such as a lake, a river, a marsh, a forest, or trail. If the Wilsons’ activities fit within this category of the Comprehensive Plan, then the trial judge was right and the majority is wrong. Clearly, the camping and staging of the trail ride into the adjacent State Forest fits the Resource-Based Comprehensive Plan category.
The majority’s refusal to accept that the Wilsons’ Special Use Permit is not inconsistent with the Comprehensive Plan is predicated on the contention that there is a category of land use in the County’s Land Development Code that fits the Wil-sons’ use more specifically than Recreation-Resource Based and since that category is not a Rural Residential category, the use is inconsistent with the Comprehensive Plan. The County’s Land Development Code does quite logically say that a proposed use should be placed into the category into which it most directly fits, for purposes of applying the Land Development Code, but that does not take the majority very far. First, the category they prefer is not more specifically applicable. More important, if a proposed land use is allowed under the Comprehensive Plan, it is not inconsistent with it.
The land use category in the County Land Development Code that the majority has settled on as being more specifically applicable to the Wilsons’ proposed uses is called “Commercial — Agriculture-Relat *677 ed.” Their position is this is the one and only slot into which the Wilsons’ activities can fall.[7]
But it does not fit that category. The definition of this land use category in the code says it applies to “commercial uses directly related to agricultural production.” (Emphasis added). The charging of a $65 fee for participation in a SEDRA trad ride does not make it a “commercial” use. It would seem instead to reinforce that it is a recreational use like any other “walk,” or “run,” or “ride” in which enthusiasts pay a fee for participation.[8] Moreover, there is no record evidence I can find that either the trail rides or the riding lessons have anything to do with “agricultural production.”
The majority simply ignores the “agricultural production” component of the section it seeks to apply. Instead, the majority relies on the examples given in the code of activities that might fall into this “Commercial — Agriculture-Related” category. The listed examples include the two that the majority has chosen to apply:

Stabling or Boarding of Farm Animals

Roadside Stand
Livestock Auction
Feed Store
Saw Mill (where wood is from trees grown on the site of the saw mill)
Slaughterhouse (where animals to be slaughtered are pastured on the site of the slaughterhouse)
Veterinary Facilities: Large Animal

Riding Academy

Airstrip for Crop Dusting
(Emphasis added).
Obviously, the use of examples in the Land Development Code is meant to elucidate the Code’s definition of the category, not the other way around. Inclusion of an example in this list does not mean that those uses are necessarily “commercial” or that they necessarily relate to “agricultural production.” That is why they are called “examples” — they may or may not apply. Clearly, not all “Stabling or Boarding of Farm Animals” is a commercial activity. Besides, “Commercial — Agriculture-Related” suggests the operation of a business on the property as its principal use. What the Wilsons propose is an incidental fee-generating activity on rural residential property, not agriculturally-related activity on commercial property. The “Commercial — Agriculture-Related” category is designed to specify where commercial activities related to agricultural production are allowed to be sited, i.e. you can’t put a stable or a slaughterhouse in the local mall.
Even more to the point, the “Stabling or Boarding of Farm Animals” in a commercial category certainly implies, as a matter of common understanding, that the landowner is paid money to stable or board the farm animals of others. Here people come and camp overnight on the Wilsons’ property with their own horse. How is that “stabling or boarding?” And how is it more like “stabling or boarding” than camping?
*678 The only argument the majority offers that the special permitted use constitutes the “Stabling or Boarding of Farm Animals” is that the participants in the trail rides keep their horses in their portable pens on the Wilsons’ property when they are not actually out on the trail. That is about as oblique an example of “Stabling or Boarding of Farm Animals” as one could conjure up. Allowing the trail ride participants to keep their horses on the property overnight while they sleep alongside in them campers does not make this the “stabling or boarding of farm animals” any more than driving a race car onto the property would make the ranch a race track. Besides, the fee here is for the competitive trail ride, not for the “stabling or boarding of farm animals.” If the majority is right, then the Wilsons could simply announce that the horses stay for free and eliminate the Comprehensive Plan issue.
Assuming that the majority can somehow surmount the obstacle that the category of “Commercial — Agriculture-Related” only applies to “uses directly related to agricultural production” and the fact that the Wilsons’ proposed activities have nothing to do with agricultural production, I will grant that the “Riding Academy” example is somewhat descriptive of Mrs. Wilson’s riding lessons. But I don’t think a residential property becomes a “Riding Academy” if a few children are given riding lessons there. “Riding Academy” implies a place of business open to the public to go and learn riding. It is a place where the owner can sell as many riding lessons to as many people as they can get through the door. It is a place where horses can be rented to ride and where equestrian goods and supplies are sold. That is not what the Wilsons are doing. Remember, section 163.3215 only does one thing. It provides a remedy if a county approves a development order that is inconsistent with the Comprehensive Plan. What the Wilsons are doing is engaging in an activity that relies on the attraction of natural resources and their facilities for active recreation, i.e., horseback riding in a rural setting. As the trial judge said, this is expressly allowed in the Comprehensive Plan. The only legitimate legal issue in this case is whether allowing riding lessons for six children at the Wilsons’ home is not an Activity-Resource-Based use under the Comprehensive Plan. Whether it is similar to examples of possible commercial agricultural uses in the Land Development Code is irrelevant.
I do not suggest that it is improper to refer to the County’s Land Development Code to understand the meaning of the terms within the Comprehensive Plan. On the contrary, I maintain that the Comprehensive Plan is the only document we should be interpreting and the way in which the County uses and interprets these terms is relevant. So, what does the County Land Development Code say about “Recreation-Resource-Based?” It says this category “includes public recreational uses that primarily rely on natural resources as the attraction.” This perfectly describes the Wilsons’ proposed use and is a description entirely consistent with the campgrounds, camps, marinas, and fish camps specifically identified in the Comprehensive Plan. In order to find inconsistency, the majority again has to bypass the definition and rely on the Code’s “examples.” The only two examples given in the Land Development Code are parks and beaches. So, says the majority, this can’t be a Resource-Based Recreational use because it isn’t a park or a beach. Just as the majority ignores that the Code defines the “Commercial-Agriculture-Based” land use category as “commercial uses directly related to agricultural production,” it ignores that Recreation-Resource-Based includes recreational uses that rely on natural resources as the attraction. If the *679 majority is right that Recreation-Resource-Based means only a park or a beach, then campgrounds and fish camps would not qualify, and yet we know that they do because the Comprehensive Plan says so.
The majority accords no deference to the trial judge’s detailed order, presumably because the only legitimate issue is the interpretation of the Comprehensive Plan. That is why most of the majority opinion is irrelevant, and its recitation of what it sees as the facts, colorful as they may be, do not matter because it is the trial judge’s job to determine the facts. The trial court heard Keene and his friends and his expert and concluded that what the Wilsons were doing was Activity-Resource Based, that the location, scale and intensity of the activities were compatible with the surrounding areas and that there was no material or undue impact on the neighbors.[9]
Finally, there is a certain irony in the outcome of this appeal. Environmentalists and other organized opponents of large-scale developments, which section 163.3215 was actually intended to address, probably never imagined, in their wildest dreams, that a proposed Development Order, consistent on its face with a County’s Comprehensive Plan, could be attacked as inconsistent by matching it with an example listed somewhere else in a county’s development code.
I would affirm.

. The Florida Division of Forestry requires a permit to conduct the rides in the State Forest, which the Wilsons obtained.

. Apparently, in order to find the meaning of the term "development order," it is necessary to go to chapter 380, the legislation pertaining to "Land and Water Management.” Section 380.031 defines a "Development Order” to be "any order granting, denying, or granting with conditions an application for a development permit.” "Development Permit” is defined to include "any building permit, zoning permit, plat approval, or rezoning, certification, variance, or other action having the effect of permitting development as defined in this chapter.” In order to ascertain what constitutes “development,” it is necessary to examine the various provisions of section 380.04, entitled "Definition of Development." There is no category in section 380.04 suggesting that a special use permit like the one we have here pertains to development. The closest is section 380.04(l)(b), which identifies as "development:” "[a] change in the *675 intensity of use of land, such as an increase in the number of dwelling units in a structure or on land or a material increase in the number of businesses, manufacturing establishments, offices, or dwelling units in a structure or on land.” But this is not that. Allowing a total of four nights of camping connected to trail rides into the adjacent State Forest and riding lessons for up to six children is not “development" and the challenged permit is not a development order. If it is not a development order, Mr. Keene does not have a cause of action under section 163.3215. Section 163.3215 is not designed to cover every land use dispute in Florida.

. Here, verbatim is the Comprehensive Plan’s authorization of Activity-Based and Resource-Based recreational uses for the Rural-Residential category:
f. Activity-Based and resource-based recreational uses are permitted subject to compliance with standards provided in the land development code. The location, scale and intensity of activity and resource-based recreational uses shall be compatible with the overall character of the existing and future development of the area. Certain resource-based recreational uses shall be further regulated as follows:
1. Marinas and fish camps will be permitted only adjacent to Georges Lake, Crescent Lake, Lake George and the St. Johns River and its major tributaries and are subject to compliance with detailed and specific standards of the land development regulations.
2. Marinas, fish camps, campgrounds and other camps may be limited in scale in the development review process to mitigate impacts on the natural resources they utilize and to mitigate impacts on adjacent residential development.

. The majority makes much of a County employee’s so-called "admission” that a "Commercial — Agricultural Related” use is not allowed in Rural Residential, but that is not the issue. Ms. Kennedy specifically testified that the Wilsons' uses are Activity-Resource-Based recreational uses. Besides, this employee’s understanding, or lack thereof, may not have carried much weight with the trial judge since she is the staff person referred to in the first part of the majority opinion who initially and erroneously recommended approval of the permit as a "Rural Recreational” use.

. Unfortunately, the record is not well developed concerning this $65 fee. If it merely covers expenses, rather than generate a profit, to call this a "commercial” use becomes even more far-fetched.

. In this case, the County has no axe to grind in this dispute between neighbors. The County wrote these documents and lives and works with them every day. The fact that Putnam County agrees that the Wilsons’ special uses are Activity-Resource-Based and not inconsistent with their Comprehensive Plan is not irrelevant. Putnam County made the policy decision in its Comprehensive Plan to allow activity/resource-based uses, including camping in rural residential areas, and has approved the Wilsons’ use to be consistent with their Comprehensive Plan.